**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY CAMDEN VICINAGE**

| | |
|---|---|
| SHARON GLASS,<br><br>    Plaintiff,<br><br>        v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | Civil No. 18-15279 (RMB)<br><br>**OPINION** |

**APPEARANCES:**

BROSS & FRANKEL, P.A.
By: Richard L. Frankel, Esq.; Kathryne H. Pope, Esq.
725 Kenilworth Ave, Suite 2
Cherry Hill, New Jersey 08002
    Counsel for Plaintiff Sharon Glass

SOCIAL SECURITY ADMINISTRATION, OFFICE OF THE GENERAL COUNSEL
By: Anne von Scheven, Special Assistant U.S. Attorney
300 Spring Garden Street, 6th Floor
Philadelphia, Pennsylvania 19123
    Counsel for the Commissioner of Social Security

**RENEE MARIE BUMB**, UNITED STATES DISTRICT JUDGE:

This matter comes before the Court upon an appeal by Plaintiff Sharon Glass ("Plaintiff"), seeking judicial review of the final determination of the Commissioner of the Social Security Administration (the "Commissioner"), which denied

1

Plaintiff's application for social security disability benefits.
For the reasons set forth below, the Commissioner's
determination will be AFFIRMED.

I.   **PROCEDURAL HISTORY**

On December 9, 2013, Plaintiff protectively filed
applications for disability insurance benefits under Title II
and supplemental security income under Title XVI of the Social
Security Act, alleging a severe disability, due to injuries to
her right thumb, described as a partial collateral ligament
disruption and post-trigger thumb release, with an Alleged Onset
Date ("AOD") of June 23, 2013.

Plaintiff's claim was initially denied on July 29, 2014,
and again upon reconsideration on November 19, 2014.  On
February 7, 2017, Plaintiff testified at an administrative
hearing held before Administrative Law Judge Kenneth Bossong
(the "ALJ").  At the hearing, Plaintiff was represented by her
attorneys, David S. Bross, Esq. and Richard L. Frankel, Esq.
The ALJ also heard testimony from a vocational expert, Gary A.
Young.

On July 6, 2017, the ALJ issued a decision denying
Plaintiff's claim for benefits, based upon his finding that
Plaintiff was not disabled and could perform work in
representative occupations, such as locker room attendant,

security guard, or an office clerical worker/helper. [R.P. at 18].  On August 21, 2018, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as final. Plaintiff now seeks this Court's review pursuant to 42 U.S.C. § 405(g).

## II.   <u>STANDARD OF REVIEW</u>

When reviewing an ALJ's final decision regarding disability benefits, a court must uphold the ALJ's factual decisions if they are supported by "substantial evidence." <u>Hess v. Comm'r Soc. Sec.</u>, 931 F.3d 198, n. 10 (3d Cir. 2019); 42 U.S.C. §§ 405(g), 1383(c)(3).  "Substantial evidence" means "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)(quoting <u>Cons. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)); <u>Albert Einstein Med. Ctr. v. Sebelius</u>, 566 F.3d 368, 372 (3d Cir. 2009).

In addition to the "substantial evidence" inquiry, the court must also determine whether the ALJ applied the correct legal standards. <u>See</u> <u>Friedberg v. Schweiker</u>, 721 F.2d 445, 447 (3d Cir. 1983); <u>Sykes v. Apfel</u>, 228 F.3d 259, 262 (3d Cir. 2000).  The Court's review of legal issues is plenary. <u>Hess</u>, 931 F.3d at n. 10 (citing <u>Chandler v. Comm'r of Soc. Sec.</u>, 667 F.3d 356, 359 (3d Cir. 2011)).

The Social Security Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The Act further states,

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated a five-step, sequential analysis for evaluating a claimant's disability, as outlined in 20 C.F.R. § 404.1520(a)(4)(i-v). The claimant bears the burden of proof at steps one through four, and the Commissioner of Social Security at step five. Hess, 931 F.3d at 201 (citing Smith v. Comm'r of Soc. Sec., 631 F.3d 632, 634 (3d Cir. 2010). Recently in Hess, 931 F.3d at 201–02, the Third Circuit described the ALJ's role in the Commissioner's inquiry at each step of this analysis:

At step one, the ALJ determines whether the claimant is performing "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If he is, he is not disabled. Id. Otherwise, the ALJ moves on to step two.

At step two, the ALJ considers whether the claimant has any "severe medically determinable physical or mental impairment" that meets certain regulatory requirements. Id. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). A "severe impairment" is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities." Id. §§ 404.1520(c), 416.920(c). If the claimant lacks such an impairment, he is not disabled. Id. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If he has such an impairment, the ALJ moves on to step three.

At step three, the ALJ decides "whether the claimant's impairments meet or equal the requirements of an impairment listed in the regulations[.]" Smith, 631 F.3d at 634. If the claimant's impairments do, he is disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If they do not, the ALJ moves on to step four.

At step four, the ALJ assesses the claimant's "residual functional capacity" ("RFC") and whether he can perform his "past relevant work." Id. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). A claimant's "[RFC] is the most [he] can still do despite [his] limitations." Id. §§ 404.1545(a)(1), 416.945(a)(1). If the claimant can perform his past relevant work despite his limitations, he is not disabled. Id. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If he cannot, the ALJ moves on to step five.

At step five, the ALJ examines whether the claimant "can make an adjustment to other work[,]" considering his "[RFC,] . . . age, education, and work experience [.]" Id. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). That examination typically involves "one or more hypothetical questions posed by the ALJ to [a] vocational expert." Podeworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984). If the claimant can make an adjustment to other work, he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If he cannot, he is disabled.

III.  **FACTUAL BACKGROUND**

The Court recites only the facts that are necessary to its determination on appeal, which is narrow.  Plaintiff, who was born on May 11, 1970, was 43 years old on the AOD and 46 years old at the time of her administrative hearing. See Plaintiff's Brief Pursuant to Local Rule 9.1 ("Pl.'s Br.")[Dkt. No. 9], at 2.  Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2015, meaning that Plaintiff must establish disability on or before that date to be entitled to benefits.

From approximately 1997 to 2000 and then 2005 to 2009, Plaintiff worked as a cleaner for a construction cleaning company.[1]  As described by Plaintiff, in this job she performed heavy duty cleaning of houses following the completion of construction projects, which sometimes involved moving heavy materials leftover from construction. [R.P. at 59]. Plaintiff also had short stints as a cashier at a retail store in 2001,

---

[1] At the administrative hearing, Plaintiff testified that she worked for the cleaning company for "over 20 years" and it was her main full-time job, but that she stopped working there in 2012 when the owner passed away. [R.P. at 58]. However, Plaintiff indicated the dates noted above (from 1997 to 2000 and then 2005 to 2009) in the "job history" section of her applications for Social Security benefits. [R.P. at 231, 244]. Although these dates do not impact this Court's analysis, the Court notes the discrepancy for the record.

as a cafeteria worker at an elementary school in 2007, and at a car dealership in 2010. Plaintiff's last full-time job was for a company called "Mail Innovations," where she worked as mail scanner for approximately seven to eight months from 2012 to 2013. Plaintiff returned to Mail Innovations on a seasonal basis in 2015, but left after only three weeks due to pain in her right hand.[2] Plaintiff has not worked since 2015.

Plaintiff's highest level of education was ninth grade. At the administrative hearing, Plaintiff testified that she can read, write, and perform basic addition, but that she struggles with subtraction and multiplication. [R.P. at 54-55]. At the time of the administrative hearing, Plaintiff testified that she was living in a house with her five children, ages 26, 25, 20, 17, and 14, and two grandchildren, a five-year-old and an eight-month-old. [R.P. at 52, 73].

### A. Plaintiff's Medical History

The primary basis for Plaintiff's benefits application is the impairment to her right hand. Plaintiff's medical records indicate that she has undergone four surgeries related to her thumb, as well as a hysterectomy, since the AOD. Plaintiff stated that none of her surgeries have improved functioning in

---

[2] According to Plaintiff, she did not resign or quit, she "just walked out" and "never went back." [R.P. at 57].

her right hand.  Plaintiff also testified that she experiences back pain and suffers from anxiety, depression, and panic attacks.

### 1. The Thumb Injury

Plaintiff testified she began having issues with her right thumb while working at Mail Innovations in 2013.  According to Plaintiff, when she "woke up one morning [her thumb] wasn't working" and she "thought [she] broke it." [R.P. at 61].  Dr. Joseph L. Gallagher, III, D.O., one of Plaintiff's primary care doctors, referred her to Dr. Stuart L. Trager, M.D., an orthopedic hand surgeon, for an evaluation.  [R.P. at 359].

Dr. Trager examined Plaintiff on June 6, 2013 and diagnosed her with stenosing tenosynovitis (trigger finger, a disorder characterized by catching or locking of the finger), noting a "2-week history of right thumb locking, catching, and swelling." [R.P. at 420].  Dr. Trager recommended cortisone injections and surgery as a last resort. [Id.].

On June 27, 2013, Plaintiff underwent a right trigger thumb release surgery (release of the A1 pulley). [R.P. at 434]. Reports from Plaintiff's monthly return visits to Dr. Trager, from July to September 2013, indicate that Plaintiff showed "markedly improved range of motion" and improved thumb posture. [R.P. at 415-18].

In August 2013, Dr. Trager reported that Plaintiff was regaining excellent range of motion. [R.P. at 432]. Although her trigger thumb condition had improved, Plaintiff continued to complain of a swelling in her knuckle at the metacarpophalangeal ("MP") joint. [Id.]. An MRI of Plaintiff's right hand in September 2013 showed evidence of a "high-grade partial tear" of the UCL, which Plaintiff told the doctor had occurred "many years earlier as a child." [R.P. at 413, 415]. In October 2013, Plaintiff continued to report improvement in thumb functioning, with no pain or locking, and she was "very pleased with outcome of her surgery," however, she was still "bothered" by the swelling at the base of her thumb. [R.P. at 414].

Plaintiff returned to Dr. Trager in January 2014 after injuring the ring finger of her right hand in a fall on ice. [R.P. at 380]. Although Plaintiff had "full range of motion and no obvious deformity," she still had tenderness and pain in her UCL. [Id.]. Dr. Trager discussed the possibility of repairing the UCL through a tendon graft, but suggested that Plaintiff revisit the idea after her upcoming pelvic surgery scheduled for March 2014. [Id.].

In July 2014, Dr. Juan Carlos Cornejo, D.O., completed a consultative examination of Plaintiff at the request of the State of New Jersey Division of Disability Determination

Services ("DDDS"). [R.P. at 396-400]. During this exam, Plaintiff reported pain along the proximal joint of the right thumb and difficulty carrying heavy objects with her right hand. [R.P. at 396]. Plaintiff stated that she could use her left hand to open doors and write. [Id.]. In a checklist completed by Plaintiff, she stated that she could drive by herself, shop alone, do laundry, feed herself, make meals by herself, dress herself, tie her shoe laces, brush her teeth, and take a shower without assistance, but could not clean by herself. [R.P. at 397]. Although Plaintiff had tenderness in her right thumb, Dr. Cornejo found that she had normal pinch, grip, and muscle strength in the muscle groups of the upper extremities bilaterally, including the biceps and triceps, and she was able to fully extend her fingers, make a fist, and oppose her thumbs bilaterally. [R.P. at 398]. Dr. Cornejo concluded that Plaintiff "would be able to handle fine and small sized objects" and had "no significant limitations to fingering such as picking and pinching objects." [R.P. at 399].

On October 9, 2014, Dr. Trager performed another operation on Plaintiff, this time to repair a thumb fracture and a UCL tear. [R.P. at 558-60]. The following month, in November 2014, Dr. Trager reported that Plaintiff looked "extremely good today with her swelling decreasing and her range of motion improving

status post pin removal and she has a positively improved appearance at the MP joint level with decreased subluxation." [R.P. at 542]. At a return visit on January 8, 2015, Plaintiff was "not particularly tender," but complained of discomfort and difficulty flexing her thumb. [R.P. at 544]. Dr. Trager recommended that Plaintiff "limit her work activities at this time" and add composite flexion and physical therapy. [Id.].

Ultimately, on June 30, 2015, Dr. Trager performed a third procedure, this time to release the tendon at the wrist and capsulotomy of the IP joint of the finger. By September 2015, Dr. Trager indicated that Plaintiff had "not regained nearly the amount of flexion [Dr. Trager] had hoped for" and noted that Plaintiff was "getting quite anxious to discuss additional surgical options." [R.P. at 554]. In November 2015, Dr. Trager noted that Plaintiff had "regained about 20 degrees IP flexion for functional use" with "equal active and passive flexion of the IP joint of the thumb." [R.P. at 556]. Although Dr. Trager discussed the possibility of additional surgery, he believed that "her therapy has been part of her problem to date" and he was trying to "work around this" given the difficulty created based on her "ability to follow through." [Id.].

In March 2016, Dr. Cornejo performed a second consultative examination at the request of DDDS. [R.P. at 579-83]. On the

checklist of daily activities, Plaintiff indicated that she was able to feed, bathe, and dress herself, drive and shop at stores by herself, put on and take off her shoes, and brush her teeth, but had difficulty doing simple laundry and preparing meals on her own. [R.P. at 580]. Dr. Cornejo stated that Plaintiff had decreased mobility, grip strength, and pinch strength in the right thumb, particularly at the IP joint, but noted that she could, however, extend her fingers, make a fist, and oppose her fingers with the right thumb. [R.P. at 582]. Dr. Cornejo opined that Plaintiff would have difficulty with repetitive motion, including pinching and grasping involving the right hand, particularly the right thumb, but had no limitations on her left hand. [Id.].

In July 2016, Dr. Trager noted that Plaintiff's right thumb was "the same" as her last visit, but that she had begun to experience pain in her other fingers from compensating for her thumb. [R.P. at 575]. Plaintiff insisted that she wanted surgery on her thumb, and did not "want to do ANY more" occupational therapy. [Id.]. Dr. Trager discussed the possibility of flexor and extensor tenolysis surgery for Plaintiff to regain some strength and ability to pinch with her thumb tip [R.P. at 575–76], which was, ultimately, performed on October 25, 2016 [R.P. at 567–68].

In early November 2016, one week after the latest surgery,
Plaintiff returned to Dr. Trager for therapy and to have her
sutures removed.  Plaintiff reported that she was making some
gains and had more strength and motion than pre-operatively [R.P.
at 571].  According to his report, Dr. Trager "again STRESSED
the need for aggressive range of motion exercises" and continued
physical therapy [Id.].  Dr. Trager removed Plaintiff's sutures
and indicated that her wounds were healing well, her active
range of motion was improved, and her strength was good [Id.].

### 2. Other Potential Impairments

After complaining of abnormal periods for approximately one
year, Plaintiff opted to have a hysterectomy in March 2014.
[R.P. at 312-349]. Post-operative reports suggest that the
hysterectomy was successful and do not indicate any issues that
would prevent her from working. [R.P. at 312-318].

Plaintiff testified that she fell "years ago," resulting in
a slipped disc in her lower back. [R.P. at 68]. Plaintiff stated
that the injury happened ten to fifteen years earlier and that
she continued to be able to do relatively physical work after
that. [Id.].  There is some, but only minimal, evidence in the
record regarding Plaintiff's complaints of lower back pain.  For
example, on April 8, 2013, Plaintiff complained of lower back
pain and diagnostic imaging was ordered. [R.P. at 361].

However, there are no other records regarding Plaintiff's alleged back pain until November 2013, when a radiographic evaluation of Plaintiff's lumbar spine showed "no significant abnormality." [R.P. at 374].

At the administrative hearing, Plaintiff testified that she suffers from depression, anxiety, and panic attacks, for which she is prescribed Klonopin and Trazodone. [R.P. at 70-71]. Plaintiff states that she is supposed to take these medications three times a day, but she only takes them "as needed" when she feels a panic attack coming on since they make her sleepy. [Id.]. Plaintiff said that her panic attacks are triggered by things that cause her stress, such as fighting or working in enclosed spaces. [Id.]. Although Plaintiff stated that she has experienced symptoms of depression, anxiety, and panic attacks since 2009, she has never been in any outpatient mental health treatment or sought treatment from a specialist, such as a psychiatrist, psychologist, or a social worker. [R.P. at 76-77].

Dr. Lawrence G. Mintzer, Ph.D., a licensed psychologist, conducted a mental status examination of Plaintiff for DDDS on July 9, 2014. [R.P. at 391-94]. Although Dr. Mintzer observed that Plaintiff "seemed a bit depressed," he noted that "her affect was appropriate to the situation" and that she was neatly dressed, adequately groomed, and "oriented to person, place, and

time." [R.P. at 393].  Dr. Mintzer found that Plaintiff had fair to poor abstract thinking, a poor ability to perform simple calculations, and poor retention and recall, but also goal-directed thought processes, coherent speech, fairly good concentration, good remote memory, fairly good recent memory, good social judgment, and good insights. [R.P. at 392-93].  Dr. Mintzer diagnosed unspecified depressive disorder and unspecified anxiety disorder, opining that Plaintiff's limitations were "moderate to severe in degree" and were "caused by a combination of physical health and psychological problems." [R.P. at 394].

### B.   The ALJ's Decision

The ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act at any time from the AOD through the date of the decision.  Upon consideration of the evidence of record and Plaintiff's testimony at the hearing, the ALJ determined that Plaintiff had a Residual Functional Capacity ("RFC") that meant she was capable of performing "light work," with only occasional handling and fingering with the right upper extremity. [R.P. at 13].

At Step One of the sequential analysis, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the AOD of June 23, 2013. [R.P. at 12].  At Step Two, the

ALJ determined that Plaintiff's "degenerative joint disease of
the metacarpal joint in the right thumb" was a severe
impairment. [Id.]. The ALJ concluded, however, that Plaintiff's
anxiety, depression, and back pain were not "severe"
impairments, because "there are only occasional and remote
notations of the claimant's subjective complaints of the
disorder." [R.P. at 13].

At Step Three the ALJ determined that Plaintiff did not
have an impairment that meets or was medically equivalent to the
severity of one of the listed impairments in 20 C.F.R. Part 404,
Subpart P, Appendix 1. [Id.].

At Step Four, the ALJ determined that the Plaintiff had the
RFC to "perform light work as defined in 20 CFR 404.1567(b) and
416.967(b) except the work may only occasionally require
handling and fingering with the right upper extremity." [Id.].
In making this decision, the ALJ assessed "all the evidence with
consideration of the limitations and restrictions imposed by the
combined the effects of the claimant's medically determinable
impairments." [Id.]. Although the ALJ found that Plaintiff's
impairments eroded her ability to perform some types of work, he
concluded that "the medical evidence overall also shows the
claimant to possess some capacity for work function." [R.P. at
17]. However, the ALJ also found that "the exertional or

postural requirements" of her past relevant work positions (of "housekeeping cleaner" and "mail router"), as actually or generally performed, exceeded her residual functional capacity.

Finally, at Step Five, the ALJ held that, considering Plaintiff's "age, education, work experience, and residual functional capacity," there are jobs available in the national economy that she could perform. During the administrative hearing, the ALJ posed hypotheticals to the vocational expert, including one in which the ALJ inquired about available jobs for an unskilled employee, at light work, with no more than occasional handling or fingering in their dominant right hand. The vocational expert noted that with such an RFC, "essentially you have a one-armed worker." [R.P. at 83]. In that scenario, the ALJ stated that jobs, such as a locker room attendant, some security guard positions, and some office clerical/helper positions, are available in the national economy. Based on the ALJ's adoption of that hypothetical as Plaintiff's RFC, the ALJ concluded that Plaintiff was not disabled as defined by the Act.

## IV. **DISCUSSION**

On appeal, Plaintiff argues that the ALJ's disability determination is not supported by substantial evidence because the ALJ: (1) failed to find Plaintiff's anxiety and depression to be severe at Step Two and failed to consider Plaintiff's back

17

pain in the RFC as a medically determinable impairment; (2) failed to perform a function-by-function analysis in his formulation of the RFC; and (3) erred in rejecting Dr. Trager's opinion regarding Plaintiff's likelihood of being "off task," without providing any rationale for the determination. As a result of these alleged deficiencies, Plaintiff argues that the ALJ incorrectly concluded that Plaintiff was not disabled under the Act. This Court disagrees with Plaintiff.

### A.    *Assessment of Impairments*

First, Plaintiff argues that the ALJ committed a reversible legal error at Step Two of the sequential evaluation process by finding that Plaintiff's anxiety and depression were not "severe" impairments. This Court disagrees with that contention.

Plaintiff correctly notes that the threshold for deeming an impairment "severe" at Step Two is quite low. To demonstrate a "severe" impairment, an applicant need only show something more than a slight abnormality or a combination of slight abnormalities which cause "more than minimal functional limitations." See Luna v. Comm'r of Soc. Sec., 2016 WL 3763339, at *4 (D.N.J. July 13, 2016)(citing 20 C.F.R. § 416.924(c)); see also Cacere v. Comm'r of Soc. Sec., 189 Fed.Appx. 59, 63 (3d Cir. 2006). However, it is well settled that a disability "is

not determined merely by the presence of a diagnosed impairment, but by the effect that the impairment has upon the individual's ability to perform substantial gainful activity." Van Mook v. Astrue, 2011 WL 3875527, at *2 (W.D. Pa. Aug. 31, 2011)(citing Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991)). To that end, an impairment may be deemed non-severe where its effects can be effectively controlled through treatment or medication. See Roberson v. Colvin, 2015 WL 4207154, at *8 (D.N.J. July 2, 2015)(citing Dearth v. Barnhart, 34 Fed.Appx. 874, 875 (3d. Cir. 2002)).

In this case, Plaintiff stated that she was diagnosed with anxiety and depression in 2009. However, she acknowledged that she continued to work with those conditions through 2013. When Plaintiff finally left her job, it was due to the thumb injury, not because of her anxiety or depression. Plaintiff also stated that her anxiety could be controlled if she took her prescribed medications. Furthermore, as noted by the ALJ, the record was devoid of any objective medical evidence indicating that Plaintiff's anxiety or depression caused more than minimal functional limitations. Indeed, there were only occasional and remote notations of the claimant's subjective complaints of the disorders. As such, the Court finds that the ALJ's conclusion,

that Plaintiff's anxiety and depression were not severe, was based on substantial evidence.

Additionally, Plaintiff contends that the ALJ erred in failing to consider Plaintiff's back pain in the RFC formulation as a medically determinable impairment. This Court must once again disagree with Plaintiff. The ALJ is not required to include every alleged limitation in their hypotheticals and RFC assessments. See O'Bryan v. Colvin, 2014 WL 4649864, at *6 (W.D. Pa. Sept. 16, 2014). Rather, the ALJ's responsibility is to "accurately convey" only "credibly established limitations" which "are medically supported and otherwise uncontroverted in the record." Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2003).

In this instance, the ALJ determined that Plaintiff had not credibly established any functional limitations related to her alleged back pain. In fact, Plaintiff herself admitted that she had worked in a job with relatively heavy lifting for years after suffering the alleged injury, without any problems. Furthermore, the few mentions of Plaintiff's back pain in the medical record did not indicate any structural damage and failed to establish anything other than subjective complaints of pain. Therefore, the ALJ's decision to exclude Plaintiff's alleged

back pain from the RFC assessment was also based upon substantial evidence.

### B.  *"Function-by-Function" Analysis*

Next, Plaintiff argues that the ALJ's determination that Plaintiff could perform "light work" was flawed, because the ALJ failed to conduct a "function-by-function" analysis, as required by Social Security Ruling ("SSR") 96-8p.  However, Plaintiff's interpretation of this "requirement" is incorrect.

Contrary to Plaintiff's assertion otherwise, the United States Court of Appeals for the Third Circuit does not require an ALJ to perform a "function-by-function" analysis at step four, so long as the ALJ's RFC determination is supported by substantial evidence in the record. See Chiaradio v. Comm'r of Soc. Sec., 425 F. App'x 158, 161 (3d Cir. 2011)(affirming the ALJ's RFC determination, despite the fact that "the ALJ did not make a task by task analysis," where the ALJ's RFC finding was supported by substantial evidence in the record, and the ALJ's "overall review carefully considered [the claimant's] past relevant work and the ALJ assessed what [the claimant] could reasonably do."); Garrett v. Comm'r of Soc. Sec., 274 F. App'x 159, 164 (3d Cir. 2008)(affirming the ALJ's RFC determination, despite the ALJ's failure to perform the precise function-by-function assessment outlined in SSR 96-8p, where the ALJ

21

questioned the claimant about the physical limitations of her prior work, and substantial evidence supported the ALJ's findings); Bencivengo v. Apfel, 2000 WL 875684, at *3 (E.D. Pa. June 14, 2000), aff'd sub nom. Bencivengo v. Comm'r of Soc. Sec., 251 F.3d 153 (3d Cir. 2000))(rejecting the notion that SSR 96-8p requires an ALJ to "make specific, written findings on dozens of individual work function categories" and opining that while a written function-by-function analysis at step four is desirable, it is not required); see also Malcolm v. Comm'r of Soc. Sec., 2017 WL 5951703, at *19 (D.N.J. Nov. 30, 2017)(holding that the Third Circuit does not require strict adherence to the function-by-function analysis set forth in Social Security Ruling 96-8p); Gaul v. Barnhart, 2008 WL 4082265, at *7 (E.D. Pa. Aug. 25, 2008)(rejecting argument that case must be remanded on the ground that the ALJ did not perform a function-by-function analysis in determining the plaintiff's RFC); Tenorio v. Berryhill, 2017 WL 4548057, at *4 (E.D. Pa. Oct. 11, 2017)(same).[3]

---

[3] The Court notes that despite ample precedential case law in support of this proposition, Plaintiff somewhat misleadingly suggests that such a standard was only supported by one "unpublished case" indicating that function-by-function analysis is "desirable, but not required." See Pl.'s Br., at 19-20.  On this point, the Court notes that the Commissioner's Brief in Opposition was even more unhelpful, failing to cite even a single case relevant and responsive to Plaintiff's arguments.

Although the ALJ did not explicitly opine on each element
of the "light work" exertional level, the ALJ's detailed RFC
analysis clearly referenced, at length, tasks relevant to the
"light work" analysis.  For example, the ALJ noted that Dr.
Cornejo's two evaluations found that Plaintiff had "good use of
her upper extremities for movements such as reaching" and "would
be able to turn and bend her neck and back, as well as walk and
stand for a reasonable amount of time with needed breaks." [R.P.
at 15-16].  Also, the ALJ explained that he rejected Dr.
Cornejo's conclusion (indicated in a "check-the-box form"
attached to the March 2016 evaluation), that Plaintiff was
unable to sit and stand for more than four hours, or walk for
more than two hours, in a work day, because this assessment was
inconsistent with Dr. Cornejo's more detailed articulation of
Plaintiff's capacity in his full written evaluation. [Id.].

In addition to his analysis of Dr. Cornejo's opinions, the
ALJ also discussed various other medical opinions evaluating
Plaintiff's ability to perform various tasks, including one that
found that Plaintiff was capable of one-handed work. [R.P. at
15].  Further, the ALJ explained how Plaintiff's ability to
perform various chores and activities around her home, where she
provided caregiving support to her five children and two
grandchildren, demonstrated some ability to perform independent

tasks. Based on the analysis contained within the ALJ's opinion and the inquiries made on the record at the administrative hearing, the Court finds that the ALJ's RFC formulation was supported by substantial evidence.

### C. Weight Given to Dr. Trager's Opinion

Finally, Plaintiff argues that the ALJ committed a reversible legal error by failing to assign proper weight to Dr. Trager's opinion that Plaintiff could only perform part-time work and that Plaintiff's symptoms would be severe enough to interfere with her attention and concentration during roughly 10% of a typical workday. [R.P. at 406]. As noted by Plaintiff, "[i]n choosing to reject the treating physician's assessment, an ALJ may not make 'speculative inferences from medical reports' and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000)(internal citations omitted).

In this instance, however, the ALJ accurately stated that Dr. Trager's assessment has no support in the record. Although Dr. Trager, an orthopedic surgeon, treated and operated on Plaintiff for the injury to her thumb, none of Dr. Trager's medical records indicate any effort at tracking or assessing the

injury's impact on Plaintiff's concentration or attention.
Rather, Dr. Trager's expertise is limited to assessing and
treating the physical limitations imposed by the thumb injury
(on matters such as range of motion, ability to grip, etc.).  In
fact, Dr. Trager's own answers, on the same form where he made
his estimation of 10% "off task," demonstrate that he lacked the
expertise to evaluate Plaintiff's mental state.  Specifically,
when asked to "identify any psychological conditions you believe
are affecting and/or resulting from your patient's condition,"
Dr. Trager checked none of the available categories, indicating
that Plaintiff suffered from neither depression nor anxiety.
[R.P. at 407].

Furthermore, it is far from clear what Dr. Trager's
assessment, that Plaintiff would be "off task" for 10% of the
workday meant. See Haugen v. Berryhill, 2018 WL 1942511, at *4
(D. Kan. Apr. 25, 2018).  Indeed, the ALJ accounted for the
thumb injury in the RFC assessment, found that Plaintiff only
had the ability to "occasionally" use her right hand.  Thus, the
ALJ only evaluated Plaintiff's ability to perform jobs with
limited need to use her right hand.  There is no evidence that
Dr. Trager's assessment accounted for the availability of jobs
with such accommodations.  As such, the Court finds that the

ALJ's decision to accord only partial weight to Dr. Trager's opinion was supported by substantial evidence.

**V.**    **CONCLUSION**

For the reasons set forth herein, the Commissioner's determination that Plaintiff is not disabled under the Social Security Act will be AFFIRMED.  An appropriate Order shall issue on this date.

**DATED**: October 31, 2019

s/Renée Marie Bumb
RENÉE MARIE BUMB
UNITED STATES DISTRICT JUDGE
